K. Winn Allen, P.C. (admitted *pro hac vice*)
Devin S. Anderson (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

Robert J. Herrington (SBN 234417)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: +1 310 586 7700
Fax: +1 310 586 7800
*Robert.Herrington@gtlaw.com*

Laura Hammargren (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
90 South 7th Street, Suite 3500
Minneapolis, MN 55402
Telephone: +1 612 259 9689
Fax: +1 612 677 3101
*Laura.Hammargren@gtlaw.com*

*Attorneys for Defendant BRK, LLC d/b/a First Alert*

*Attorneys for Defendant Walter Kidde Portable Equipment, LLC d/b/a Kidde Safety Equipment*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN PONS, CAROLINE COLEMAN, CHARLES BELLAVIA, AND TERRI KLETZMAN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALTER KIDDE PORTABLE EQUIPMENT, LLC d/b/a Kidde Safety Equipment and BRK, LLC d/b/a First Alert,<br><br>Defendants. | CASE NO. 3:23-CV-03436-MMC<br><br>**DEFENDANTS WALTER KIDDE PORTABLE EQUIPMENT, LLC AND BRK, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed Date: August 26, 2024<br>Judge:     Hon. Maxine M. Chesney<br>Hearing Date: March 13, 2026<br>Time:     9:00 a.m.<br>Courtroom:  7 |

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on March 13, 2026, the undersigned will appear before the Honorable Senior Judge Maxine M. Chesney of the United States District Court for the Northern District of California in Courtroom 7, 19th Floor, at the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, and shall then and there present Defendants Walter Kidde Portable Equipment, LLC and BRK, LLC's Motion for Summary Judgment.

The Motion is based on this Notice, the attached Memorandum of Points and Authorities, the summary judgment evidence, the pleadings, and other papers on file, any oral argument, and any other evidence the Court may consider in hearing this Motion.

**RELIEF REQUESTED**

Defendants ask that the Court enter judgment in their favor and dismiss plaintiffs' claims in full.

**STATEMENT OF THE ISSUES TO BE DECIDED**

On August 26, 2024, plaintiffs, who seek to represent a putative class of alarm purchasers, filed their Second Amended Class Action Complaint alleging that defendants' marketing of certain smoke alarms was false, misleading, and fraudulent. Only one claim remains, a claim under California's Consumer Legal Remedies Act (CLRA), Civil Code §§ 1750, et seq.

Defendants' Motion presents the following issues to be decided:

1.  Whether defendants' labeling and marketing of ionization smoke alarms as "smoke alarms" is false or misleading, as informed by the Phase I question of whether ionization smoke alarms detect smoke from smoldering fires.

2.  Whether plaintiffs' CLRA claim fails under the safe-harbor doctrine.

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD ............................................................................................. 4

ARGUMENT .......................................................................................................... 5

I.    Ionization Smoke Alarms Detect Smoke From Smoldering Fires ................... 5

    A.    Plaintiffs' CLRA Claim Requires Them To Show That Ionization Smoke Alarms Cannot Detect Smoke From  Smoldering Fires ........... 6

    B.    Ionization Smoke Alarms Can Detect Smoke From Smoldering Fires ............................. 7

        1.    Plaintiffs' Smoke Alarms Passed A Smoldering Smoke Test Before They Were Sold And Maintained Certification While They Were On The Market ......................................... 7

        2.    For Years, Safety Authorities Have Confirmed That Ionization Smoke Alarms Detect Smoldering Fires.................................................. 11

    C.    Plaintiffs Have Failed To Show That Ionization Smoke Alarms Cannot Detect Smoke From Smoldering Fires.......................................... 14

    D.    Plaintiffs' Revised Theory Fails As A Matter Of Law ....................... 15

        1. Plaintiffs' Revised Theory Is Contrary To Law ................................ 16

        2. Plaintiffs' Revised Theory Is Contrary To Fact ............................... 18

II.    California's Safe-Harbor Safe Doctrine Precludes Plaintiffs' Claims ........... 21

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alvarez v. Chevron Corp.*,
   656 F.3d 925 (9th Cir. 2011) ...............................................................................21, 23, 24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................................5

*Angiano v. Anheuser-Busch InBev Worldwide, Inc.*,
   532 F. Supp. 3d 911 (C.D. Cal. 2021) ...........................................................................23

*Anunziato v. eMachines, Inc.*,
   402 F. Supp. 2d 1133 (C.D. Cal. 2005) .........................................................................18

*Barber v. Nestlé USA, Inc.*,
   154 F. Supp. 3d 954 (C.D. Cal. 2015) ...........................................................................23

*Bird v. First Alert, Inc.*,
   2015 WL 3750225 (N.D. Cal. June 15, 2015) ............................................................3, 16

*Cel–Tech Comms., Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (Cal. 1999)............................................................................................21

*Cullen v. Netflix, Inc.*,
   880 F. Supp. 2d 1017 (N.D. Cal. July 13, 2012) ...........................................................18

*Davidson v. Apple, Inc.*,
   2017 WL 3149305 (N.D. Cal. July 25, 2017)................................................................17

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) .......................................................................................23

*Ebner v. Fresh Inc.*,
   2013 WL 9760035 (C.D. Cal. Sept. 11, 2013) ..............................................................23

*Edmunson v. Procter & Gamble Co.*,
   2011 WL 1897625 (S.D. Cal. May 17, 2011)................................................................18

*Ely Holdings Ltd. v. O'Keeffe's, Inc.*,
   2021 WL 390946 (N.D. Cal. Feb. 3, 2021) ...................................................................19

*Felice v. Guardian Technologies LLC*,
   2024 WL 3642187 (N.D. Cal. July 30, 2024)...........................................................17, 18

*Johnson v. Walter Kidde Portable Equipment, Inc.*,
   Civ. A. No. 03-425-JMH (E.D. Ky.) ..............................................................................15

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lowry v. City of San Diego*,
   858 F.3d 1248 (9th Cir. 2017) ...................................................................................5

*Martin v. Ford Motor Co.*,
   2025 WL 1012299 (C.D. Cal. Mar. 28, 2025) ........................................................23

*McGinity v. Proctor & Gamble Co.*,
   69 F.4th 1093 (9th Cir. 2023) ...................................................................................6

*Newton v. Am. Debt Servs., Inc.*,
   2013 WL 5592620 (N.D. Cal. Oct. 10, 2013) ..........................................................5

*Olivier v. Baca*,
   913 F.3d 852 (9th Cir. 2019) .....................................................................................5

*S. Cal. Darts Ass'n v. Zaffina*,
   762 F.3d 921 (9th Cir. 2014) .....................................................................................5

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
   992 F. Supp. 2d 962 (C.D. Cal. 2014) ...............................................................17, 18

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) ..................................................................18

*Warren Tech., Inc. v. UL LLC*,
   962 F.3d 1324 (11th Cir. 2020) .................................................................................8

*Zito v. United Tech. Corp.*,
   2016 WL 2946157 (D. Conn. Mar. 11, 2016) ................................................3, 6, 16

*Zito v. United Tech. Corp.*,
   673 F. App'x 117 (2d Cir. 2016) .............................................................................16

**Statutes**

Cal. Health & Safety Code § 13114(a) ..............................................................21, 22, 24

Cal. Residential Code, Tit. 24, Part 2.5 § R314.1.1 .................................................9, 19

**Regulations**

19 C.C.R. § 200 *et seq.* ..............................................................................................11, 22

19 C.C.R. § 209..............................................................................................................22

19 C.C.R. § 212..............................................................................................................22

19 C.C.R. § 213..............................................................................................................22

19 C.C.R. § 743..........................................................................................................11, 22

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

19 C.C.R. § 744 .................................................................................................................22

19 C.C.R. § 756 .................................................................................................................22

24 C.F.R. § 3280.209 ........................................................................................................19

29 C.F.R. § 1910.7(b) ..........................................................................................................8

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................4

**INTRODUCTION**

Ionization smoke alarms save lives. These vital products detect smoke particles and alert occupants to the presence of smoke. Since the use of smoke alarms in homes has become commonplace, deaths from fire in the United States have plummeted—a feat for which ionization smoke alarms deserve significant credit. Government and safety authorities recommend the use of ionization alarms in homes, and millions use these devices to protect their loved ones and properties.

Yet plaintiffs filed this remarkable lawsuit against defendants Walter Kidde Portable Equipment ("Kidde") and BRK, LLC ("First Alert") for selling ionization smoke alarms. Plaintiffs do not allege that their ionization smoke alarms are defective, failed to alarm in response to a fire, or had any other operational issue. Instead, plaintiffs' theory is that it is misleading to call ionization smoke alarms "smoke alarms" on defendants' packaging because—according to plaintiffs—ionization smoke alarms do not detect smoke from a smoldering fire. ECF No. 49 at 2-3. That allegation flies in the face of scientific and regulatory consensus that ionization smoke alarms protect against all types of potential fires.

Plaintiffs' CLRA claim nevertheless squeaked by a motion to dismiss because, at that stage, the Court had to accept as true plaintiffs' allegation that ionization smoke alarms "cannot detect a smoldering fire at all." *Id.* The Court was rightly skeptical about the veracity of that allegation and recognized that this case falls apart if that allegation does not hold up in discovery.

The allegation that ionization smoke alarms cannot detect smoldering fires is false. Ionization smoke alarms detect all types of fires, including smoldering fires. Plaintiffs have exactly zero evidence that ionization smoke alarms cannot detect smoldering fires. They will not claim otherwise in opposing this motion.

Fifty years of studies have shown that ionization smoke alarms detect smoldering fires. That is why government and safety groups from the California State Fire Marshal to the Consumer Product Safety Commission to the United States Fire Administration have recommended that ionization alarms be used in consumers' homes—and call these devices "smoke alarms" to boot. Plaintiffs never intended to defend the allegation that got them past a motion to dismiss, and it is indefensible. That alone is grounds for judgment for defendants.

Plaintiffs have now pivoted to a far more nebulous theory: that ionization smoke alarms do not "reliably" detect smoke from smoldering fires. That revised theory also fails. For one, the descriptive term "smoke alarm" makes no representation about the "reliability" of ionization smoke alarms, let alone their "reliability" in detecting smoldering fires—and thus has no bearing on plaintiffs' CLRA claim. For another, defendants' packaging expressly discloses the relative strengths of ionization technology (better at detecting smoke from the more dangerous flaming fires) and photoelectric technology (better at detecting smoke from slower developing smoldering fires), while recommending that consumers use both. Numerous fire and safety authorities say the exact same thing. That is why the Court's motion-to-dismiss ruling held plaintiffs to their allegation that ionization alarms do not detect smoke *at all*. And it is the failure of that allegation that causes plaintiffs' claims to fail as a matter of law.

Plaintiffs' claims also run headlong into the safe-harbor doctrine. That doctrine prohibits claims based on conduct permitted by statute or regulation. The California State Fire Marshal has issued regulations that require smoke alarms sold in California to be specifically "approved and listed" by the State Fire Marshal. It is undisputed that defendants' smoke alarms were "approved and listed" under this regulatory scheme, which means plaintiffs cannot challenge their sale through the CLRA.

Plaintiffs' case hung by a thread after motions to dismiss. Discovery has shown that the only allegation that mattered is false, contradicts nationally codified standards, and defies science. Manufacturers who supply ionization smoke alarms in compliance with such standards are not misleading the public. The Court should grant summary judgment for defendants.

## BACKGROUND

Kidde and First Alert are two major manufacturers of smoke alarms. Both companies have manufactured smoke alarms that use "ionization" technology to detect smoke and alert occupants of a potential fire. Ionization-only smoke alarms have been sold in the United States for decades, by defendants and others. *See* Ex. A-1 (3P-CAFIRE0000584) at 591 (California State Fire Marshal Smoke Alarm Task Force (2011)).[1] Smoke alarms that use "photoelectric" technology as their detection method, including

---

[1] Filed concurrently with this Memorandum is the Declaration of Devin Anderson (attaching Exhibits A-1 to A-33); the Declaration of Manny Gonzalez, on behalf of Kidde (attaching Exhibits B-1 to B-20); and the Declaration of Mark Devine, on behalf of First Alert (attaching Exhibits C-1 to C-11).

those sold by Kidde and First Alert, have also been available for decades. *See id.* Ionization and photoelectric technologies are the primary types of smoke alarms in the United States. *Id.* Although both technologies have been available for many years, ionization-only smoke alarms are by far the most common type of smoke alarm consumers have used to protect their homes from fire, at times representing over 90% of the smoke alarms used in U.S. residences. *Id.*

There are also two types of fires: flaming, which have a visible flame and develop quickly, and smoldering, which do not. *See* Ex. A-2 (KIDDE00196650) at 196653 (CPSC, Smoke Alarms – Why, Where, and Which, CPSC Pub. 559, 2008). In general, ionization smoke alarms are more effective at sensing smoke particles that are associated with flaming fires, while photoelectric smoke alarms are better at sensing smoke particles associated with smoldering fires. *Id*. The relative strengths of each technology are well-established and have been known for decades. *See* Ex. A-3 (KIDDE00003668) at 3680 (National Fire Protection Ass'n (NFPA) Task Group Report (2008)); Ex. A-4 (KIDDE00003291) at 3311 (1977 Dunes II Study). Kidde and First Alert smoke-alarm packaging disclose those relative strengths and recommend that, for best protection, both types of technologies should be used within the home. *See, e.g.*, Ex. B-19 (KIDDE00060247) (Kidde Packaging); Ex. C-3 (BRK012939) (First Alert Packaging).

Plaintiffs brought claims challenging defendants' labeling of ionization-only smoke alarms as "smoke alarms" under California's Unfair Competition Law (UCL), False Advertising Law (FAL), and the CLRA.[2] Plaintiffs Pons and Coleman purchased i12010SCO, i12010S, i9010, i12060A, and i9070 model Kidde ionization-only smoke alarms, while plaintiffs Bellavia and Kletzman purchased SC9120LBL and FG200 model First Alert ionization-only smoke alarms. ECF No. 110 ¶¶ 91, 95, 97, 101. As plaintiffs put it, defendants allegedly misled the public by selling ionization-only smoke alarms, which they claimed are "deceptively and misleadingly advertised, labeled, and packaged as 'smoke alarms.'" ECF No. 110 ¶ 8. Plaintiffs' theory resembled claims in two failed cases, *Bird v. First Alert, Inc.*, 2015 WL 3750225 (N.D. Cal. June 15, 2015), and *Zito v. United Tech. Corp.*, 2016 WL 2946157 (D. Conn. Mar. 11, 2016).[3] In both cases, the plaintiffs brought consumer-protection claims challenging the labeling

---

[2] Plaintiffs' operative complaint is the Second Amended Complaint, ECF No. 110, which makes the same substantive allegations as their original Complaint.

[3] All citations and quotations have been cleaned up and emphasis added, unless otherwise specified.

of ionization devices as smoke alarms, and the defendants prevailed at the pleading stage. Citing those cases and others, defendants moved to dismiss all claims, and the Court granted defendants' motions as to the UCL and FAL claims. *See* ECF No. 49 at 5-6.

The Court identified a narrow potential path forward for plaintiffs' CLRA claim based on a possible ambiguity in "the phrase 'Smoke Alarm.'" *Id.* at 2. That "phrase is arguably ambiguous as to whether the device will sound an alarm irrespective of the type of fire or only if the smoke is the result of a certain type of fire." *Id.* The Court considered whether language on defendants' packaging—which disclosed that ionization alarms detect flaming fires sooner than photoelectric alarms and that photoelectric alarms detect smoldering fires sooner than ionization alarms—cured that ambiguity. *Id.* at 3 n.2. But the Court noted that plaintiffs' allegation was "not that ionization detectors detect smoke from smoldering fires *more slowly* than photoelectric detectors, but, rather, that they cannot detect a smoldering fire *at all*." *Id.* at 2-3 (citing Compl. ¶ 31, alleging that ionization detectors "*will not sound* unless and until the fire has progressed to a hot, flaming fire"). That distinguished this case from *Bird* and *Zito*, as those plaintiffs "accepted the assertion on the packaging that ionization detectors *can* detect smoke from smoldering fires," while the plaintiffs here, according to their complaint, did not. *Id.* at 3 n.3. This allegation carried plaintiffs' CLRA claim past a motion to dismiss.

The Court then phased discovery to focus the parties on the central factual question that could resolve this case: whether ionization smoke detectors detect smoldering fires. As the Court explained at the parties' case-management conference, "the only reason" the case survived defendants' motions to dismiss is because plaintiffs alleged that ionization smoke alarms "don't work at all" for smoldering fires. ECF No. 64 at 7:1-11. While the Court "doubted whether that was factually correct," the Court had to credit that allegation at the pleading stage. *Id.*; ECF No. 49 at 3. To get to the heart of this threshold factual issue in the case, the Court ordered an initial phase of discovery directed at "whether ionization smoke detectors detect smoldering fires." ECF No. 60. The Court allowed defendants to file motions for summary judgment following the completion of this initial phase of discovery. ECF No. 171.

## LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it

would "affect the outcome of the suit," and a dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014).

Plaintiffs carry the "ultimate burden of proof" in this case. *Newton v. Am. Debt Servs., Inc.*, 2013 WL 5592620, at *3 (N.D. Cal. Oct. 10, 2013). As a result, to prevail on summary judgment, "[defendants] need only point out 'that there is an absence of evidence to support [plaintiffs'] case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019). The burden then shifts to plaintiffs to set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "The mere existence of a scintilla of evidence in support of [plaintiffs] position will be insufficient; there must be evidence on which the jury could reasonably find for [plaintiffs]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

Plaintiffs' false-advertising claim hinges on a single question: whether ionization smoke alarms detect smoldering fires. They do. Because plaintiffs have no evidence that ionization smoke alarms cannot detect smoldering fires—and have not even tried to offer such evidence—their claim is insufficient as a matter of law. Independently, the safe-harbor doctrine bars plaintiffs' claims. Judgment should be entered for defendants.

## I.    Ionization Smoke Alarms Detect Smoke From Smoldering Fires

This Court should grant judgment for defendants because ionization smoke alarms detect smoke from smoldering fires. Plaintiffs' false-advertising claim survived a motion to dismiss on, and now falls with, the allegation that ionization smoke alarms cannot detect smoldering fires. There is no genuine dispute that ionization smoke alarms can detect smoke from smoldering fires. Each of defendants' alarms at issue in this case passed a smoldering-smoke test, and decades of science have confirmed the efficacy of ionization detection technology. Plaintiffs have offered no evidence to the contrary. Their attempt to reframe this case around elastic notions of "reliability" or "efficiency" of ionization smoke alarms in detecting smoldering fires are legally and factually flawed and do not defeat summary judgment.

1

2

### A. Plaintiffs' CLRA Claim Requires Them To Show That Ionization Smoke Alarms Cannot Detect Smoke From Smoldering Fires

Plaintiffs claim that it is false or misleading to label smoke alarms that use only ionization technology as "smoke alarms." Plaintiffs do not contest that ionization devices can and do sound alarms to flaming fires. Their problem is with ionization smoke alarms' purported inability to detect smoke from smoldering fires. Their complaint specifically alleges that ionization alarms "cannot detect a smoldering fire ***at all***." ECF No. 49 at 3.

The Court recognized that this "cannot detect a smoldering fire at all" allegation was ***the*** crucial allegation that, if true, might call into question the labeling of an ionization-only device as a "smoke alarm." That "phrase is arguably ambiguous as to whether the device will sound an alarm irrespective of the type of fire or only if the smoke is the result of a certain type of fire." *Id.* at 2. The only way plaintiffs' false-advertising theory would work, then, is if ionization alarms were simply incapable of detecting smoke from one type of fire (smoldering). *See id.* at 2-3 & n.2.

Plaintiffs' false-advertising claim does not work if the theory is that ionization smoke alarms are slower (or too slow) at detecting smoke from smoldering fires. It is not false or misleading to call smoke alarms that detect smoke "smoke alarms," no matter how quickly or slowly they do so, because "the alarms do, in fact, detect smoke." *Zito*, 2016 WL 2946157, at *4. All the more when defendants' packaging supplies "clarifying language" that "state[s], in essence, that ionization detectors detect smoke from smoldering fires but not as fast as photoelectric detectors." ECF No. 49 at 2-3 & n.2. That clarifying language resolved any ambiguity as to the relative strengths and weaknesses of ionization technology. *Id.* (citing *McGinity v. Proctor & Gamble Co.*, 69 F.4th 1093, 1098-99 (9th Cir. 2023) (where front label is ambiguous rather than "unambiguously deceptive," ambiguity "can be resolved by reference to the back label")). And plaintiffs themselves have expressly disclaimed the theory that "ionization detectors detect smoke from smoldering fires more slowly than photoelectric detectors." *Id.* at 3; *see, e.g.*, ECF No. 167 at 2 (Plaintiffs' Statement of Facts Relevant to Phase I) ("Plaintiffs' claims in no way depend on any comparison between ionization and photoelectric detector response times.").

And so, the only potential path forward for plaintiffs' false-advertising claim is the one the Court identified: plaintiffs' allegation that ionization smoke alarms "cannot detect a smoldering fire at all." ECF

No. 49 at 3. If the evidence shows that ionization smoke alarms can detect smoke from smoldering fires, there is no basis for plaintiffs' claim that labeling them as "smoke alarms" is false or misleading—because they are, literally, smoke alarms.

### B.     Ionization Smoke Alarms Can Detect Smoke From Smoldering Fires

Of course ionization smoke alarms can detect smoke from smoldering fires. ***First***, it is undisputed that all of defendants' ionization smoke alarms were certified by an independent safety organization, and that to obtain and maintain that certification, defendants' ionization smoke alarms had to regularly pass a smoldering-fire test. ***Second***, it is also undisputed that numerous safety authorities in California and across the nation have concluded that ionization smoke alarms are suitable for consumers to use in the home because they detect all types of fire, including smoldering fires, and that those safety authorities themselves call ionization smoke alarms "smoke alarms." Defendants are in good company.

### 1.     Plaintiffs' Smoke Alarms Passed A Smoldering Smoke Test Before They Were Sold And Maintained Certification While They Were On The Market

UL Standards and Engagement ("ULSE") is one of the nation's foremost authorities on product safety. ULSE publishes safety standards that are followed by various industries, including standards for smoke alarms. Ex. A-5 (Mar. 5, 2025 ULSE 30(b)(6) Dep.) at 23:4-5; 44:2-6. Those standards are developed through a rigorous, scientific, and consensus-based process with input from a variety of experts who participate in ULSE's Technical Committees. *See* Ex. A-6 (Mar. 6, 2025 ULSE 30(b)(6) Dep.) at 40:20-41:1; *see also id.* at 122:10-14 ("[W]e don't publish anything unless it's gone through the consensus process."). ULSE "convene[s] and facilitate[s] Technical Committee meetings," and those Technical Committees write, vote on, and publish standards. Ex. A-5 (Mar. 5, 2025 ULSE 30(b)(6) Dep.) at 22:23-23:3. Members of the Technical Committee are not employed by ULSE; they instead come from representatives of consumers, governmental authorities, and manufacturers, among other interest groups. *Id.* at 69:24-70:15.

Products are tested to a ULSE standard through a certification and listing process. *See* Ex. A-6, (Mar. 6, 2025 ULSE 30(b)(6) Dep.) at 51:17-52:18. Each standard sets forth tests that the product must pass to obtain certification. Ex. A-7 (UL 217 6th Ed.) at 4-6 (Table of Contents listing the tests required by the UL 6th Ed). If a product passes the applicable tests, it is then "certified" to the UL standard and

can bear the UL mark. *See* Ex. A-8 (Feb. 20, 2025 M. Gonzalez Dep.) at 27:16-28:15. Federal law recognizes and relies on the UL certification process, *see, e.g.*, *UL LLC*, Occupational Safety and Health Administration ((last visited Sept. 3, 2025) https://www.osha.gov/nationally-recognized-testing-laboratory-program/ul), and federal regulations mandate that the UL certification process involves a Nationally Recognized Testing Laboratory (NRTL), which must follow strict Occupational Safety and Health Administration requirements to ensure that the testing and certification process produces creditable, objective results. *See* 29 C.F.R. § 1910.7(b). As relevant in this case, the NRTLs include UL Solutions (a ULSE affiliate) and Intertek.[4] *Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1326 (11th Cir. 2020) (recognizing UL as an OSHA-accredited NRTL); Devine Decl. ¶ 9. Products that achieve UL certification must also continually pass random re-testing while they are on the market to maintain that certification listing. Ex. A-8 (Feb. 20, 2025 M. Gonzalez Dep.) at 27:16-28:15; Ex. A-9 (KIDDE00054905) at 54905-06 (UL Follow-Up Service Procedure); Ex. C-1 (BRK000023) at 92 (Intertek Listing Report for First Alert SC9120B model series) (describing follow-up testing).[5]

The UL 217 standard applies to smoke alarms for residential use and sets forth the UL certification process for smoke alarms. Ex. A-5 (Mar. 5, 2025 ULSE 30(b)(6) Dep.) at 44:2-9; Ex. C-1 (BRK000023) at 83 (Intertek Listing Report) (describing standard applied). Residential codes throughout the United States, including California's, ***require*** smoke alarms to be listed to UL 217. *See* 2025 Cal. Residential

---

[4] UL Standards & Engagement and UL Solutions used to be part of the same entity, but are currently separated into different corporate entities.

[5] The First Alert devices alleged to have been purchased by certain plaintiffs in the Second Amended Complaint are the SC9120LBL and the Family Gard 200 ("FG200") models. ECF No. 110 ¶¶ 97, 101. Those models were certified, listed, and reviewed under the lead model in their model series. Devine Decl. ¶¶ 6-7 (Model SC9120LBL is part of the SC9120B series, and model FG200 is part of the FG250 series); *see also* Ex. C-1 (BRK000023) at 55 (Intertek Listing Report for First Alert SC9120B model series) (showing that the SC9120LBL is an alternate model construction); *see also* Ex. C-4 (BRK004582) at 4583 (Intertek Listing Report for First Alert FG250 model series, including FG200 in that model series).

The Kidde smoke alarms alleged to have been purchased by plaintiffs Pons and Coleman are the i12010SCO, i12010S, i9010, i12060A, and i9070 model Kidde ionization-only smoke alarms. ECF No. 110 ¶¶ 91, 95. Those models were certified, listed, and reviewed by UL. Ex. B-1 (KIDDE00049229) at 49254 (UL Certificate of Compliance for model i12010SCO); Ex. B-2 (KIDDE00043765) at 43919 (UL Certificate of Compliance for model i12010S); Ex. B-3 (KIDDE00001623) at 1626 (UL testing record certifying model i9010); Ex. B-4 (KIDDE00013880) at 14871 (UL testing record indicating that model i12060A was certified by UL); Ex. B-5 (KIDDE00010329) at 10370-71 (UL Certificate of Compliance for i9070).

1    Code, Tit. 24, Part 2.5 § R314.1.1. These residential codes, along with UL 217, establish performance

2    standards to safeguard the public from fire and allow time for occupant escape. *See id.* at 1.1.2; Ex. A-1

3    (3P-CAFIRE0000584) at 590, 592-93, 602-04 (California State Fire Marshal Smoke Alarm Task Force

4    (2011)).

5            Plaintiffs' alarms are subject to the Sixth Edition of UL 217, which was in effect until mid-2024.

6    *See* Ex. C-11 (BRK007747) (Intertek notification about 8th Edition effective date). The Sixth Edition

7    required every smoke alarm to pass a smoldering-smoke test and approximately 70 other tests before the

8    alarm could be "certified" to the UL 217 standard. *See* Ex. A-7 (UL 217 6th Ed.) at 4-6, 76-78. During

9    the smoldering-smoke test, the accredited third-party agencies test multiple samples of an ionization

10   smoke alarm model in a controlled environment known as a "fire test room." *See id.*; *see also, e.g.*, Ex.

11   B-11 (KIDDE00001715) at 1729, 1732 (Follow-Up Testing Memo.). A smoldering fire is ignited. Ex. A-

12   7 (UL 217 6th Ed.) at 76. While the fire smolders, measurements are continually taken, including the

13   amount of smoke in the room and when the alarms respond to it. *See, e.g.*, Ex. B-11 (KIDDE00001715)

14   at 1732-33 (Follow-Up Testing Memo.); Ex. A-7 (UL 217 6th Ed.) at 77-78. If the alarm sounds before a

15   UL 217-set threshold is met, the smoke alarm has "passed" the smoldering-smoke test. Ex. A-7 (UL 217

16   6th Ed.) at 77. In addition, UL 217 mandates tests that ensure a smoke alarm avoids "nuisance" alarms

17   (false alarms that are not in response to an actual fire) to a certain degree and tests that make sure that the

18   alarm can respond to a "flaming" fire (a fire that quickly erupts into flames) within sufficient time. *See id.*

19   at 62-75, 79 (nuisance and flaming fire tests).

20           It is undisputed that plaintiffs' ionization smoke alarms were certified to UL 217, Sixth Edition.

21   *See* Devine Decl. ¶ 10, Ex. C-2 (BRK000194) (Intertek authorization to mark SC9120B series as

22   compliant with UL 217, Sixth Edition); *id.* ¶ 13, Ex. C-5 (BRK008276) (Intertek authorization to mark

23   FG200 model to UL 217, Sixth Edition); Ex. B-1 (KIDDE00049229) at 49254 (UL Certificate of

24   Compliance for Kidde model i12010SCO); Ex. B-2 (KIDDE00043765) at 43919 (UL Certificate of

25   Compliance for Kidde model i12010S); Ex. B-3 (KIDDE00001623) at 1626 (UL testing record certifying

26   Kidde model i9010); Ex. B-4 (KIDDE00013880) at 14871 (UL testing record certifying Kidde model

27   i12060A); Ex. B-5 (KIDDE00010329) at 10370-71 (UL Certificate of Compliance for Kidde model

28   i9070). It is likewise undisputed that each ionization-only smoke alarm model at issue underwent testing—

as developed by the UL 217 Technical Committee and set forth in the standard—to determine whether it could detect smoke from smoldering fires before it was put on the market. *See, e.g.*, Devine Decl. ¶ 9, Ex. C-1 (BRK000023) at 80 (testing summary in Intertek Listing Report). And it is undisputed that each alarm at issue passed that smoldering-smoke test. *See* Ex. B-6 (KIDDE00002749) at 2752 (Kidde model i12060A ionization smoke alarm smoldering smoke test results, showing that the model passed a smoldering smoke test); Ex. B-10 (KIDDE00043765) at 44185-86, 44190-91 (Kidde model i12010SCO passed smoldering test); Ex. B-8 (KIDDE00101306) at 101307-09 (Kidde model i9010 passed smoldering smoke test); Ex. B-9 (KIDDE00010329) at 11225-26 (Kidde model i9070 passed smoldering smoke test); Ex. B-7 (KIDDE00043394) at 43733-35 (Kidde model i12010S passed smoldering smoke test); Ex. C-1 (BRK000023) at 80 (First Alert SC9120B ionization smoke alarm model series smoldering smoke test summary, reflecting model passed) Ex. C-4 (BRK004582) at 4618 (First Alert FG200 ionization smoke alarm smoldering smoke test summary, reflecting model passed).

Moreover, as the listing process requires, plaintiffs' models were available for, and often underwent, follow-up smoldering-smoke tests once on the market. Each maintained their certification to UL 217, further confirming their ability to detect smoldering fires over time. *See* Ex. B-11 (KIDDE00001715) at 1733 (Kidde model i12060A ionization smoke alarm "follow-up" testing results, showing that the model passed the smoldering smoke test as a part of that follow-up testing); Ex. B-12 (KIDDE00000003) at 20 (Kidde model i12010SCO passed smoldering smoke test in follow-up testing); Ex. B-13 (KIDDE00000858) at 876 (Kidde model i9010 passed smoldering smoke test in follow-up testing); Ex. B-20 (KIDDE00043765) at 43798-99 (Kidde model i12010S passed smoldering smoke test in follow-up testing); Ex. C-6 (BRK001625) (First Alert SC9120B ionization smoke alarm model series "follow-up" testing results, showing smoldering smoke test was passed); Ex. C-7 (BRK005137) (First Alert FG200 ionization smoke alarm "follow-up" testing results, showing smoldering smoke test was passed); Ex. C-8 (BRK001630) (additional First Alert smoke alarm follow-up testing showing smoldering smoke tests were passed).

Plaintiffs will not deny that defendants' devices were certified to the UL 217 standard that is recognized by federal and state law. Plaintiffs will not deny that Kidde and First Alert had to demonstrate that each of plaintiffs' ionization alarm models could pass the UL smoldering-smoke test before those

alarms were sold. Plaintiffs will not deny that the at-issue models passed the UL 217 smoldering-smoke test. And plaintiffs will not deny that Kidde and First Alert had to (and did) continue to pass smoldering-smoke tests in periodic follow-up testing to stay listed to the UL 217 standard. These undisputed facts confirm that Kidde and First Alert ionization devices can detect smoke from smoldering fires.

### 2. For Years, Safety Authorities Have Confirmed That Ionization Smoke Alarms Detect Smoldering Fires

While UL 217 is the gold standard and certification of defendants' alarms pursuant to that standard is dispositive of plaintiffs' claims, the Court can also take comfort from the fact that safety authorities in California and around the country have independently concluded that defendants' ionization smoke alarms detect all types of fires, including smoldering fires, and recommend that consumers use them in their homes. And throughout their publications, these authorities refer to ionization smoke alarms as "smoke alarms."

Because ionization smoke alarms detect smoldering fires, the California State Fire Marshal ("State Fire Marshal") has advised consumers that they are suitable for use in their homes as smoke alarms. In 2011, the Office of the State Fire Marshal convened a task force to evaluate "the effectiveness of smoke detection technology including ionization and photoelectric, and other technologies, complying with current California State Fire Marshal listing standards, and used in residential occupancies as required by California regulations." Ex. A-1 (3P-CAFIRE0000584) at 589, 594 (California State Fire Marshal Smoke Alarm Task Force (2011)). The task force expressed awareness of the "perceived concerns with ionization smoke alarms" including in fires "with an extended initial smoldering phase," but concluded—based on its analysis of these issues and dozens of testing and research studies—that all listed smoke alarm technologies, including ionization, "provide an acceptable level of protection, regardless of the sensing technology, if they are properly located, installed and maintained." *Id.* at 604, 610.

California's regulatory scheme also confirms that ionization alarms detect smoke from all types of fires and are safe for consumer use. The State Fire Marshal permits smoke alarms to be "market[ed], distribute[d], offer[ed] for sale, or [sold]" in California only if they have been "previously approved and listed by the State Fire Marshal" under its approval process. 19 C.C.R. § 743; *see also* 19 C.C.R. § 200 *et seq.* (outlining process for fire alarm device approval). In addition to being listed to the UL 217 standard,

1    plaintiffs' ionization smoke alarms were approved and listed by the State Fire Marshal. *See* Ex. C-9

2    (BRK000001) (BRK SC9120B Fire Marshal Listing) ("Listed as [a] combination ***ionization smoke*** and

3    electrochemical carbon monoxide ***alarm***"); Ex. C-10 (BRK002123) (BRK FG200 listing); Ex. B-14

4    (KIDDE00182460) (Kidde i12060A "Listed as … ionization type smoke alarms"); Ex. B-15 (3P-

5    CAFIRE0001698) (Kidde i9010 is "Listed as a single station ionization smoke alarm"); Ex. B-16

6    (KIDDE00140241) (i12010SCO "listed as combination ionization smoke and electrochemical carbon

7    monoxide (CO) alarms"); Ex. B-17 (KIDDE00194410) (Kidde i9070 "Listed as single station ionization

8    smoke detectors"); Ex. B-18 (KIDDE00188692) (Kidde i12010S "Model listed as an ionization smoke

9    alarm").

10        Other national safety authorities have likewise recommended that consumers use ionization smoke

11   alarms. For example, in 2008, the United States Consumer Public Safety Commission (CPSC), an

12   independent federal regulatory agency focused on consumer product safety, told consumers that "[b]oth

13   ionization and photoelectric detectors are effective smoke sensors." Ex. A-2 (KIDDE00196650) at 196652

14   (CPSC, Smoke Alarms – Why, Where, and Which, CPSC Pub. 559, 2008).

15        Those recommendations are consistent with the longstanding scientific consensus that ionization

16   smoke alarms detect smoke from smoldering fires. Mountains of studies confirm this fact. The first well-

17   known study was conducted in 1975 by the National Bureau of Standards, now known as the National

18   Institute of Science and Technology ("NIST"), which is an agency of the Department of Commerce, one

19   of the nation's oldest physical science laboratories, and a leader in promoting standards to improve overall

20   quality of life. Ex. A-10 (KIDDE0002911) (1975 Dunes I Study). NIST conducted full-scale tests of

21   flaming and smoldering fires in real homes at various locations and evaluated the performance of

22   ionization and photoelectric alarms in those conditions. Ex. A-4 (KIDDE00003291) at 3294 (1977 Dunes

23   II Study); Ex. A-10 (KIDDE00002911) at 2932 (1975 Dunes I Study). NIST concluded that either type of

24   smoke alarm "with small lag time would provide more than adequate life saving potential under most real

25   residential fire conditions." Ex. A-10 (KIDDE00002911) at 2932 (1975 Dunes I Study). While it noted

26   that the two types of smoke alarms may differ in how quickly they sound depending on the type of fire,

27   NIST concluded that "the differences are minimal when compared on an escape time and life saving

28   potential basis." *Id.* NIST performed additional confirmatory tests two years later and came to the same

conclusion: "A residential smoke detector of either the ionization or photoelectric type set at the sensitivity levels encountered during this study would provide adequate life saving potential under most real residential fire conditions when properly installed." Ex. A-4 (KIDDE00003291) at 3311 (1977 Dunes II Study).

NIST reconfirmed these conclusions decades later in 2008, when it published its findings from one of the largest and most comprehensive studies on home smoke alarms ever conducted. Ex. A-11 (KIDDE00003861) (NIST 2008 TN 1455-1). That study again examined the performance of ionization and photoelectric smoke alarms, and NIST again concluded that "[s]moke alarms of either the ionization type or the photoelectric type consistently provided time for occupants to escape from most residential fires." *Id.* at 4149.[6]

Fire-industry authorities have confirmed NIST's findings multiple times over. These entities independently analyzed NIST's data to confirm, among other things, the performance of ionization smoke alarms in smoldering fires. These authorities found that ionization smoke alarms detect smoke from smoldering fires and are suitable for use in residences. For example, a task group formed by the National Fire Protection Association ("NFPA")—which included plaintiffs' expert Dr. B. Don Russell and Jay Fleming, one of the "[f]ire officials" that plaintiffs rely upon, *see* Ex. A-15 (Pons's Supp. R&Os to Kidde Irrog. 13) at 3, alongside over a dozen subject-matter experts—studied the performance of ionization alarms in smoldering fires. Ex. A-3 (KIDDE00003668) at 3668 (National Fire Protection Ass'n (NFPA) Task Group Report (2008)). The task group specifically considered findings from NIST and written critiques from Dr. Russell and Mr. Fleming, and the group concluded that ionization smoke detectors "generally provid[e] acceptable response to smoldering fires." *Id.* at 3701. In 2009, the NFPA task group issued a follow-up report that considered studies that plaintiffs' experts have cited and, again, the task group issued conclusions supporting the use of ionization alarms to detect smoldering fires. Ex. A-16

---

[6] When pressed about testing data from this study at his deposition, plaintiffs' expert Dr. Babrauskas was forced to admit that, in fires where conditions became too unsafe to exit, the data showed that ionization smoke alarms detected smoldering fires before these unsafe conditions were reached 91% of the time. Ex. A-12 (July 10, 2025 Babrauskas Dep.) at 185:12-189:2. Dr. Russell claimed that NIST's testing data showed a "marked delay" in *when* ionization smoke alarms sounded, but he did not (because he could not) claim that the tested ionization smoke alarms did not detect smoldering fires. *See* Ex. A-14 (June 17, 2025 Russell Dep.) at 106:21-110:14; *see also* Ex. A-13 (Russell Report) ¶¶ 18-19 (asserting "marked slow response" and "substantial delay" in ionization alarms' response to smoldering fires).

(KIDDE00003724) at 3741 (NFPA Task Group Follow-Up Report); *see also* Ex. A-1 (3P-CAFIRE0000584) at 610 (California State Fire Marshal Smoke Alarm Task Force (2011)) (considering 2008 NIST study and other findings on smoke alarm performance and concluding that ionization and photoelectric alarms alike "provide an acceptable level of protection, regardless of the sensing technology, if they are properly located, installed and maintained.").

The United States Fire Administration (USFA), a federal agency within the Federal Emergency Management Agency, has independently investigated and funded research directly relevant to the detection of smoldering fires by ionization alarms. According to the USFA, the "body of scientific knowledge about fire, smoke, and smoke detection" reflects that both photoelectric and ionization alarms "will detect the smoke from either a smoldering fire or a flaming fire." Ex. A-17 (U.S. Fire Administration, Position Statements, Home smoke alarms (2023)) at 2, ((last visited Sept. 8, 2025) https://tinyurl.com/mw3cdchz). The USFA's finding rests on scientific data and knowledge from NIST, the CPSC, the NFPA, UL, the Home Fire Safety Council, the Residential Fire Safety Institute, the Home Fire Sprinkler Coalition, and "distinguished academics with expertise in smoke alarm and sensor technology." *Id*.

Other peer-reviewed studies by industry experts have reached the same conclusion. *See, e.g.*, Ex. A-18 (KIDDE00043377) at 43388 (Milarcik, E., Olenick, S., Roby, R., *A Relative Time Analysis of the Performance of Residential Smoke Detection Technologies*, Fire Technology (2008)) ("[T]his study demonstrates that ionization, photoelectric, and combination detectors provide statistically equivalent warning to different types of fires for the next fire occurrence.")).

Defendants could go on, but the overwhelming weight of authority is clear: ionization alarms detect smoke from smoldering fires. They are safe and effective for use in homes. Plaintiffs will not be able to deny that these regulatory authorities have reached these conclusions.

### C.    Plaintiffs Have Failed To Show That Ionization Smoke Alarms Cannot Detect Smoke From Smoldering Fires

In the face of testing results, governmental conclusions, and scientific analysis showing that ionization alarms detect smoke from smoldering fires, plaintiffs have quite literally nothing. They have no support for the only allegation that got them past a motion to dismiss: that ionization smoke alarms

cannot detect smoldering fires at all. None of plaintiffs' experts opined that ionization smoke alarms cannot detect a smoldering fire. To the contrary, Dr. Russell has conceded that "in the presence of some smoldering fires[,] some makes and models of ionization detectors will sound a timely alarm." Ex. A-19 (May 16, 2005 Russell Dep., *Johnson v. Walter Kidde Portable Equipment, Inc.*, Civ. A. No. 03-425-JMH (E.D. Ky.)) at 158:25-159:4; *see also* Ex. A-14 (June 17, 2025 Russell Dep.) at 398:4-11 (admitting that ionization alarms will, on some occasions, sound before a fire transitions into an open flame fire). Dr. Babrauskas, who had *only* ionization alarms in his home for years (Ex. A-12 (July 10, 2025 Babrauskas Dep.) at 17:22-18:1), acknowledged that studies showed that ionization alarms detect smoldering fires. *Id.* at 137:2-140:15, 153:1-4, 153:5-154:11, 154:15-156:5, 161:13-162:21 and 164:25-165:24. Mr. Fleming did not agree to serve as a testifying expert for plaintiffs and stated he could not support arguments plaintiffs intended to raise. *See* Ex. A-20 (PLTFS0072362); Ex. A-21 (Feb. 27, 2025 Fleming Dep.) at 319:9-13 (agreeing that "ion alarms can get triggered and can provide some benefit" in a smoldering fire, even if not "as much benefit as a photo alarm").

Plaintiffs themselves have not even attempted to establish that fact, either. Each time defendants asked plaintiffs to provide evidence in support of their contention, not a single plaintiff asserted that ionization alarms cannot detect smoldering fires. They instead dodged the question and made vague statements about reliability and adequacy. *See, e.g.*, Ex. A-22 (Plaintiff Caroline Coleman's R&Os to Kidde's 1st Irrogs, Resp. to Irrog. 4) at 4; Ex. A-23 (Plaintiff Stephen Pons' R&Os to Kidde's 1st Irrogs, Resp. to Irrog 4) at 5; Ex. A-24 (Plaintiff Chuck Bellavia's R&Os to First Alert's 1st Irrogs, Resp. to Irrog. 4) at 4-5; Ex. A-25 (Plaintiff Terri Kletzman's R&Os to First Alert's 1st Irrogs, Resp. to Irrog. 4) at 4-5.

Plaintiffs do not have a shred of evidence supporting the only allegation that allowed their complaint to evade dismissal. Despite more than a year of discovery, there is nothing in the record supporting plaintiffs' contention that ionization smoke detectors "cannot detect a smoldering fire at all." ECF No. 49 at 3. Judgment should be granted for defendants.

**D.    Plaintiffs' Revised Theory Fails As A Matter Of Law**

Plaintiffs have declined to pursue the claim the Court allowed past a motion to dismiss and instead are now trying to pursue a theory that ionization devices do not "effectively," "timely," or "reliably" detect smoldering fires, based on their own subjective definitions of effectiveness, timeliness, and reliability. No

1   doubt that is what the Court will hear from plaintiffs in response to defendants' straightforward arguments

2   in this motion. However worded, this theory fails as a matter of law.

### 1.   Plaintiffs' Revised Theory Is Contrary To Law

4       *First*, plaintiffs' theory is at odds with defendants' representations. The term "smoke alarm" makes

5   no representation about the devices' "reliability" in detecting smoldering fires and thus has no bearing on

6   whether it is misleading under the CLRA to call ionization detectors "smoke alarms." Defendants' labeling

7   represents that the device will alarm to smoke. The only potential ambiguity in the term "smoke alarm"

8   is, as the Court explained, "whether the device will sound an alarm irrespective of the type of fire or only

9   if the smoke is the result of a certain type of fire,"—not whether the devices "reliably" detect smoldering

10  fires (whatever that means). ECF No. 49 at 2. In short, to prevail on their CLRA claim, plaintiffs must

11  establish that defendants' representation that their products are "smoke alarms" is false or misleading. *Id.*

12  at 3. Because defendants only represent that "an alarm will sound when the device detects smoke," *id.* at

13  2, plaintiffs' evidence about ionization alarms' "reliability" has no bearing on their claim.

14      Claims about the timing or efficacy of ionization smoke alarms put this case right back where it

15  started. Defendants' motion to dismiss relied on two cases, *Bird* and *Zito*, where plaintiffs trafficked in

16  these same speculative theories and courts rightly shut them down. Those cases were filed against the

17  same defendants as here and, like this case, challenged defendants' labeling of their ionization smoke

18  alarms under consumer protection statutes. *See Zito*, 2016 WL 2946157, at *2; *Bird*, 2015 WL 3750225,

19  at *2-4. Both were dismissed at the pleading stage. In *Zito*, the plaintiffs pointed to differences in

20  ionization and photoelectric technology's speed in detecting smoldering fires, claiming that on account of

21  that difference, marketing ionization alarms as "smoke alarms" was misleading. 2016 WL 2946157, at

22  *1-2. The court squarely rejected that argument because plaintiffs "did not plausibly allege facts

23  suggesting that the Kidde alarm[s] do [] not detect smoke." *Zito v. United Tech. Corp.*, 673 F. App'x 117,

24  120 (2d Cir. 2016); *see also Bird*, 2015 WL 3750225, at *10 (dismissing CLRA claim where "plaintiff

25  allege[d] no facts showing that the smoke alarms were in fact 'defective'").

26      This Court distinguished those cases because the plaintiffs there "accepted the assertion on the

27  packaging that ionization detectors can detect smoke from smoldering fires"—unlike the plaintiffs here,

28  who pleaded that ionization detectors cannot detect smoke from smoldering fires. ECF No. 49 at 3 n.3.

1  But plaintiffs' revised factual theory makes clear that, like the plaintiffs in *Bird* and *Zito*, these plaintiffs

2  *do* "accep[t] the assertion … that ionization detectors *can* detect smoke from smoldering fires." *Id.* They

3  just believe ionization detectors do not detect smoldering fires as quickly as plaintiffs would like. As in

4  *Bird* and *Zito*, dismissal of plaintiffs' claims is appropriate here.

5  This Court considered and dismissed similar claims in *Felice v. Guardian Technologies LLC*, 2024

6  WL 3642187 (N.D. Cal. July 30, 2024). As here, the *Felice* plaintiffs posited a factual theory unrelated to

7  the labeling representations they claimed were misleading. In *Felice*, the defendants represented that their

8  air purifiers had greater germ-killing capabilities because they used two methods of purifying air (HEPA

9  filters and UV-C bulbs) instead of just one, like other air purifiers. *Id.* at *1. The plaintiffs brought a CLRA

10  claim arguing that such a representation was false, but they did not allege that the dual-air-purification

11  method had the same capabilities as a single method. *Id.* Instead, they alleged that a single pass through

12  the UV-C bulbs provided no material benefit. *Id.* But that wasn't what defendants claimed. Because

13  nothing in the plaintiffs' claim "render[ed] false defendants'" representation, this Court dismissed their

14  CLRA claim. *Id.* at *3.

15  Other California federal courts have dismissed claims when plaintiffs have tried to bring false-

16  advertising claims based on vague and unverifiable statements unconnected to the defendant's actual

17  representation. For example, in *Davidson v. Apple, Inc.*, Apple represented that its iPhones had titanium

18  inserts, which they did. 2017 WL 3149305, at *12 (N.D. Cal. July 25, 2017). The plaintiffs did not

19  challenge that fact; instead, they alleged that Apple misled them because its iPhone's "stainless steel and

20  titanium inserts [did] not sufficiently reinforce the iPhone because the iPhone suffer[ed] from [a]

21  touchscreen defect." *Id.* That allegation about "sufficiency" was not enough to show that Apple made any

22  sort of misrepresentation in advertising that the iPhones had titanium inserts because they did, in fact,

23  have titanium inserts. Likewise, in *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, Toyota represented

24  that the Toyota Prius had an automatic braking feature, which was true. 992 F. Supp. 2d 962, 968 (C.D.

25  Cal. 2014). Plaintiffs did not contest that representation, instead only alleging that the speed reduction

26  from the automatic braking feature was "negligible." *Id.* at 974-75. The court dismissed the CLRA claim

27  because Toyota did not make any representation that the feature "would operate at a particular level of

28  efficiency, or that it would conform to any particular standard." *Id.*

So too here: plaintiffs' new factual theory about reliability, timing, and performance is not connected to defendants' labeling of the devices as smoke alarms. Defendants have represented that their ionization smoke alarms are "smoke alarms" and detect smoke from flaming and smoldering fires. That label makes no representation about the smoke alarms' "reliability," "sufficiency," or "level of efficiency" in detecting any type of fire, let alone smoldering fires specifically. As in *Felice*, "there is nothing" in plaintiffs' new factual theory "that render[s] false defendants' statement" that their ionization devices are smoke alarms. 2024 WL 3642187, at *3.

**Second**, plaintiffs' revised theory also relies on hopelessly vague and unverifiable concepts like "reliability" that are not actionable under the CLRA. "An alleged misrepresentation must relate to an objectively verifiable fact; subjective representations" are not actionable. *Edmunson v. Procter & Gamble Co.*, 2011 WL 1897625, at *3 (S.D. Cal. May 17, 2011). That is why courts have consistently held that plaintiffs cannot maintain CLRA claims based on representations that products are "reliable," *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1140 (C.D. Cal. 2005) or "dependable," *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1136 (N.D. Cal. 2010).

Plaintiffs' claims are no different than those cases. Even though defendants' products make no claim about reliability, plaintiffs' new theory appears to be that defendants' "representations . . . impl[y]" that their smoke alarms will "reliably" detect smoke. *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1026 (N.D. Cal. July 13, 2012). But "[a] representation that the" smoke alarms reliably detect smoke "is a vague and subjective claim and therefore is not actionable under the . . . CLRA." *Id.* (plaintiff could not maintain a claim on Netflix's representations that "implied Netflix had 'meaningfully' captioned its content" because "meaningful" was a "vague and subjective claim").

### 2. Plaintiffs' Revised Theory Is Contrary To Fact

Even if plaintiffs' revised theory were actionable, there is no dispute that ionization smoke alarms reliably detect smoke from smoldering fires. It is undisputed that each ionization model that defendants sold has undergone UL certification, which includes testing that ensures that the smoke alarm can detect a smoldering fire. Because plaintiffs cannot deny that simple fact, they will try claim that certification to UL standards is not indicative of whether the smoke alarms are "effective" or "reliable." But the UL

certification process is independent, rigorous, and scientific; it is designed to ensure that products are safe for consumers. That is why safety regulators—including in California—rely on UL 217.

Government entities have explicitly relied on certification to UL standards, and thus the UL 217 smoldering-smoke test, in recommending (or requiring) which smoke alarms should be installed in buildings. For example, the California Residential Code **requires** smoke alarms to "be listed in accordance with UL 217." 2025 Cal. Residential Code, Tit. 24, Part 2.5 § R314.1.1. Federal building regulations likewise **require** any smoke alarms to "conform with the requirements of UL 217" (or UL 268, its equivalent for commercial structures). *See, e.g.*, 24 C.F.R. § 3280.209 (Housing and Urban Development safety standards for smoke alarms in manufactured home construction). Simply put, "UL … [is a] recognized authorit[y] for certifying compliance with safety standards," so unsurprisingly, government organizations rely on UL's certification. *Ely Holdings Ltd. v. O'Keeffe's, Inc.*, 2021 WL 390946, at *5 n.8 (N.D. Cal. Feb. 3, 2021). Plaintiffs cannot dispute this widespread reliance on UL standards.

Because they cannot deny the import and the impact of UL certification on the case-dispositive question, plaintiffs will inevitably point to the new edition of the UL 217 standard that recently became effective. In June 2024, the Sixth Edition of UL 217 was replaced by the Eighth Edition. Ex. C-11 (BRK007747) (Intertek notification about 8th Edition effective date). That new edition had several new tests that smoke alarms had to pass to obtain UL certification, including a new "nuisance" alarm test and new flaming and smoldering tests that used a different material. *See, e.g.*, Ex. A-26 (UL 217, Standard for Safety Smoke Alarms, Eighth Edition) at 81, 96, 101. The Eighth Edition—which became effective after plaintiffs filed this case—cannot salvage plaintiffs' claims.

For one, none of plaintiffs' alarms were certified to the Eighth Edition. Plaintiffs' alarms were manufactured and sold between August 2019 and May 2024, while the Sixth Edition was effective. ECF No. 110 ¶¶ 91, 95, 97, 101. UL standards evolve over time and hopefully improve the safety of the products they regulate. But the issuance of a new edition of the standard does not invalidate the prior standard. *See* Ex. A-27 (ULSE_025250) (UL document, explaining that updates to a UL Standard do not render products certified to earlier standard unsafe); Ex. A-12 (July 10, 2025 Babrauskas Dep.) at 30:19-31:2 (admitting that the UL 217 Eighth Edition was not a requirement until June 30, 2024, and that alarms manufactured and sold before that date do not have to meet the Eighth Edition requirements standards). And it certainly

does not mean that devices certified to the prior edition of the standard suddenly become a safety issue;[7] otherwise, one would expect governments to demand recalls of products certified to prior editions every time a new edition became effective. That is not what happens. This illogical result would require consumers to discard acceptable, functioning legacy products and to re-purchase new products once a new standard is adopted, whether they be smoke alarms, kitchen appliances, automobiles, air conditioners or others.

For another, the smoldering-smoke test that each of plaintiffs' alarms passed as part of certification to the Sixth Edition is also part of the Eighth Edition. *See* Ex. A-26 ("UL 217, Standard for Safety Smoke Alarms, Eighth Edition") at 93. It is still a test that UL believes shows whether the device is capable of detecting smoke from a smoldering fire. Ex. A-27 (ULSE_025250) at 25251 (UL document, explaining that Sixth Edition tests remain applicable). Although the Eighth Edition added another smoldering-smoke test that used synthetic materials to complement the test that uses wood, that addition does nothing to discount the Sixth Edition test that is still recognized as showing smoke alarms' capacity to detect smoldering fires. Any attempt to rely on the Eighth Edition to support plaintiffs' claims should be rejected.

The Eighth Edition of UL 217 was a sea change in the industry. When that standard was published, every single smoke alarm that was on the market had to be re-designed to meet the new tests, regardless of whether they used ionization technology, photoelectric technology, or both. *See* Ex. A-8 (Feb. 20, 2025 M. Gonzalez Dep.) at 235:7-236:1; *see also* Ex. A-29, (Feb. 12, 2025 B. Goodrich Dep.) at 106:5-9. So plaintiffs' theory that any device not certified under the Eighth Edition is not a "smoke alarm" leads to the illogical and unsupported result that ***every single smoke alarm*** on the market until mid-2024 misled customers. That cannot be true. The Eighth Edition was the product of years of work aimed at making smoke alarms better for consumers, whether by having fewer nuisance alarms, ensuring an optimal response to different types of flaming fires, or adding additional requirements related to smoldering fires.

---

[7]  *See* Ex. A-12 (July 10, 2025 Babrauskas Dep.) at 31:9-33:15 (refusing to say that alarms certified to the Sixth Edition standard were unsafe and, instead, characterizing Sixth Edition alarms only as not compliant with the Eighth Edition); *see also* Ex. A-28 (July 24, 2025 Fleming Dep.) at 55:7-56:16 (discussing Ex. A-20 (Dep. Ex. 293)) ("I don't think that the UL 217 Sixth Edition photoelectric alarms are unsafe."); Ex. A-20 (PLTFS0072362).

Those scientific advancements in no way render the prior editions of the UL 217 standard irrelevant or insufficient.[8]

Plaintiffs must admit that all defendants' ionization smoke alarms were certified to the operative Sixth Edition of UL 217 and had to repeatedly pass smoldering smoke tests to obtain that certification. Government and safety organizations around the country recognize that ionization alarms protect consumers and can safely detect smoke from all types of fire, including smoldering fires. There is thus no genuine dispute of material fact that plaintiffs' ionization-only alarms "reliably" detect smoldering fires.

## II. California's Safe-Harbor Safe Doctrine Precludes Plaintiffs' Claims

Dismissal of plaintiffs' claim is also appropriate for an independent reason: California law provides safe harbor against CLRA claims that challenge conduct the Legislature has permitted. Plaintiffs should not be permitted to second guess the California Fire Marshal, whom the legislature entrusted with the regulation of smoke alarms.

The safe-harbor doctrine prohibits claims when, as here, "the Legislature has permitted certain conduct or considered a situation and concluded no action should lie." *Cel–Tech Comms., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (Cal. 1999). "[P]laintiffs may not use the general unfair competition law"—or the CLRA—"to assault that harbor" by arguing that the permitted conduct or omission is unlawful. *Id.*; *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 933–34 (9th Cir. 2011) (applying safe-harbor doctrine to CLRA claims). California has expressly considered and approved the sale and use of defendants' ionization smoke alarms, which means that plaintiffs cannot use the CLRA to second-guess the State's judgment.

The Legislature delegated to the State Fire Marshal the authority to regulate the "quality and installation" of all "fire alarm devices that are marketed, distributed, offered for sale, or sold in" California. Cal. Health & Safety Code § 13114(a). California law—and regulations issued by the State Fire Marshal—

---

[8] Defendants took two approaches in response to these new requirements: First Alert developed ionization alarms that ultimately received certification under the Eighth Edition of UL 217, while Kidde made a business decision to stop manufacturing ionization alarms. *See* Ex. A-8 (Feb. 20, 2025 M. Gonzalez Dep.) at 40:21-41:12; Ex. A-30 (Mar. 4, 2025 M. Devine Dep.) at 28:20-29:3. Neither defendant, however, attempted to certify their Sixth Edition alarms to the Eighth Edition standard.

specifically prohibit the marketing, distribution, or sale of any smoke alarm that is not "approved and listed by the State Fire Marshal." *Id.* § 13114(b)(1); 19 C.C.R. § 743.

Vested with authority from the Legislature, the State Fire Marshal enacted regulations governing the approval and listing of smoke alarms in California. To be listed, smoke alarms must be tested, and the testing reports from approved testing organizations (like UL Solutions and Intertek) must be submitted to the State Fire Marshal for review and analysis. 19 C.C.R. §§ 209, 213 (setting forth requirements for testing reports); Ex. A-31 (State Fire Marshal, Approved Testing Laboratories) (listing UL Solutions and Intertek). The State Fire Marshal may also require that sample specimens, taken from a manufacturer's regular production, be submitted for evaluation. 19 C.C.R. § 209; *see also* 19 C.C.R. § 200 *et seq*. (outlining process for fire alarm device listing). Smoke alarms must also conform with safety code NFPA 72, including for "performance tests," 19 C.C.R. § 756, which requires smoke alarms to comply with applicable certification standards, which in California is UL 217. Ex. A-32 (3PNFPA0001872) at 2056 § 29.10.2 (NFPA 72); Ex. A-33 (KIDDE00099428) (State Fire Marshal, Listing Category and Applicable Standard). Once approved and listed, the regulations require that evidence of the State Fire Marshal's listing be furnished to a purchaser at the time of purchase or delivery. 19 C.C.R. § 744; *see also* 19 C.C.R. § 212 (labeling requirement for listed products).

It is undisputed that defendants' ionization smoke alarms were approved and listed by the State Fire Marshal in compliance with California law. *See* C-9 (BRK000001) (BRK SC9120B Fire Marshal Listing) ("Listed as a combination *ionization smoke* and electrochemical carbon monoxide *alarm*"); Ex. C-10 (BRK002123) (BRK FG200 listing); Ex. B-14 (KIDDE00182460) ("Listed as … ionization type *smoke alarms*"); Ex. B-15 (3P-CAFIRE0001698); *see also supra* I.B.2. And publications from the State Fire Marshal confirm that defendants' ionization smoke alarms are properly approved and listed. As discussed above, *supra* I.B.2, the State Fire Marshal also was aware of "perceived concerns with ionization smoke alarms," but concluded that all smoke alarms "provide an acceptable level of protection, regardless of the sensing technology, if they are properly located, installed and maintained." Ex. A-1 (3P-CAFIRE0000584) at 610 (California State Fire Marshal Smoke Alarm Task Force (2011)).

Because defendants' ionization smoke alarms are listed and approved by the State Fire Marshal under California's regulatory structure, the safe-harbor doctrine protects defendants' conduct and

plaintiffs' CLRA claims must fail. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1166 n.3 (9th Cir. 2012) (safe harbors apply to both legislation and regulations adopted under legislative mandate); *Angiano v. Anheuser-Busch InBev Worldwide, Inc.*, 532 F. Supp. 3d 911, 917 (C.D. Cal. 2021) (safe harbors apply to regulatory certification processes). Courts in the Ninth Circuit hold that compliance with regulatory regimes provide a safe harbor. *See, e.g., Martin v. Ford Motor Co.*, 2025 WL 1012299, at *9 (C.D. Cal. Mar. 28, 2025) (finding a safe harbor from UCL and CLRA claims because the California Air Resources Board certified what vehicle parts should receive a warranty); *Angiano*, 532 F. Supp. 3d at 917 (finding a safe harbor from claims of mislabeling of an alcoholic beverage because the Tobacco Tax and Trade Bureau reviewed the label and issued a certificate of approval); *see also Ebner v. Fresh Inc.*, 2013 WL 9760035, at *5-6 (C.D. Cal. Sept. 11, 2013), *aff'd*, 838 F.3d 958, 964 (9th Cir. 2016) (shielding defendant from liability because "both the FDA and the California legislature have decided that consumers will be adequately protected if a cosmetic label provides the net quantity of contents in accordance with the statutory requirements"); *Davis*, 691 F.3d at 1165 (holding defendants were entitled to safe harbor for their annual fee disclosure because it complied with the regulations that the Truth in Lending Act delegated to the Board of Governors of the Federal Reserve Bank); *Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954, 959 (C.D. Cal. 2015), *aff'd*, 730 F. App'x 464 (9th Cir. 2018) (finding safe harbor doctrine did not allow plaintiffs to second guess a problem California had considered).

The Ninth Circuit has expressly confirmed that California's approval of devices under a regulatory scheme provides a safe harbor against CLRA claims. In *Alvarez v. Chevron Corp.*, for example, the plaintiffs filed a putative class action claiming that the design of the defendant's retail gasoline dispensers caused purchasers to receive residual fuel from previous purchasers, which resulted in the plaintiffs receiving fuel at lower-than-advertised octane levels. 656 F.3d at 928. By statute, the California Department of Food and Agriculture's Division of Measurement Standards (DMS) regulated retail gasoline dispensing in California. *Id.* at 929. DMS regulations required the defendant to submit the gasoline dispensers for certification to ensure that they met California's regulatory requirements and received DMS approval before their use or sale. *Id.* Recognizing that the gasoline dispensers had received regulatory approval under the DMS process, the Ninth Circuit affirmed the district court's ruling that the specific regulatory requirements for retail gasoline dispensing "may not be trumped by the general

prohibitions of the CLRA" and, accordingly, defendants "were entitled to safe harbor from Plaintiffs' CLRA claims." *Id.* at 933-34. In other words, "California law unequivocally permits Defendants' conduct, therefore affording safe harbor from UCL [and CLRA] liability." *Id.* at 933.

This case merits the same result. By statute, the State Fire Marshal regulates all smoke alarms that are distributed and sold in California, and the law requires that all smoke alarms be approved and listed by the State Fire Marshal before they are sold. Cal. Health & Safety Code § 13114(a)-(b). As in *Alvarez*, defendants' ionization alarms have been approved for sale by the state authority responsible for their regulation. Just like the *Alvarez* plaintiffs, plaintiffs have alleged there is a flaw in the regulated devices under the CLRA, despite the State's certification and approval. And, like *Alvarez*, the regulatory framework and approval of defendants' ionization smoke alarms means that plaintiffs' CLRA claim is precluded by California safe harbor law and must be dismissed. This is especially the case given that the State Fire Marshal expressly considered plaintiffs' theories and concluded that ionization smoke alarms provide an acceptable level of protection in response to smoldering fires. Ex. A-1 (3P-CAFIRE0000584) at 610 (California State Fire Marshal Smoke Alarm Task Force (2011)). Put simply, the State Fire Marshal provided a detailed regulatory framework for smoke alarms that cannot be "trumped by the general prohibitions of the CLRA." *Alvarez*, 656 F.3d at 933-34.

## CONCLUSION

The Court should enter judgment for defendants on plaintiffs' CLRA claim.

DATED: September 10, 2025                    Respectfully submitted,

                                            KIRKLAND & ELLIS LLP


                                            */s/ Devin S. Anderson*
                                            K. Winn Allen, P.C. (admitted *pro hac vice*)
                                            Devin S. Anderson (admitted *pro hac vice*)
                                            KIRKLAND & ELLIS LLP
                                            1301 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004
                                            Telephone: +1 202 389 5000
                                            Facsimile: +1 202 389 5200
                                            winn.allen@kirkland.com
                                            devin.anderson@kirkland.com

                                            Michael P. Esser (SBN 268634)
                                            KIRKLAND & ELLIS LLP
                                            555 California Street
                                            San Francisco, CA 94104
                                            Telephone: +1 415 439 1400
                                            Facsimile: +1 415 439 1500
                                            michael.esser@kirkland.com

                                            *Attorneys for Defendant Walter Kidde Portable
                                            Equipment, LLC d/b/a Kidde Safety Equipment*


                                            GREENBERG TRAURIG, LLP

                                            */s/ Robert J. Harrington*
                                            Robert J. Herrington (SBN 234417)
                                            GREENBERG TRAURIG, LLP
                                            1840 Century Park East, Suite 1900
                                            Los Angeles, California 90067-2121
                                            Telephone: +1 310 586 7700
                                            Fax: +1 310 586 7800
                                            Robert.Herrington@gtlaw.com

                                            Laura Hammargren (admitted *pro hac vice*)
                                            GREENBERG TRAURIG, LLP
                                            90 South 7th Street, Suite 3500
                                            Minneapolis, MN 55402
                                            Telephone: +1 612 259 9689
                                            Fax: +1 612 677 3101
                                            *Laura.Hammargren@gtlaw.com*

                                            *Attorneys for Defendant BRK, LLC d/b/a First
                                            Alert*

1

## SIGNATURE ATTESTATION

I, Devin S. Anderson, attest that all signatories listed above, on whose behalf the filing is submitted, concur in the filing's content and have authorized the e-filing of the foregoing document. I further attest that counsel for BRK, LLC has provided their consent for the public filing of certain documents previously designated as "Confidential" under the February 27, 2024 Stipulated Protective Order (ECF No. 70).

/s/ Devin S. Anderson
Devin S. Anderson

1

2

**CERTIFICATE OF SERVICE**

On September 10, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF. All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ Devin S. Anderson*
Devin S. Anderson